Lloyd **HAMMONDS**, Plaintiff,

v.

**AETNA CASUALTY & SURETY COMPANY, Defendant.**

**No. C 64–736.**

United States District Court
N. D. Ohio, E. D.
Jan. 6, 1965.

---

Sheldon R. Walker, Willoughby, Ohio, Edward H. Stinson, Cleveland, Ohio, for plaintiff.

Arter, Hadden, Wykoff & Van Duzer, Smith Warder, Cleveland, Ohio, for defendant.

CONNELL, Chief Judge.

The plaintiff has filed complaint against the defendant for allegedly inducing the interruption of a physician-patient relationship and for allegedly inducing the divulgence of confidential information gained through that relationship. The case is here by reason of diversity of citizenship, the defendant being a Connecticut corporation, with its principal place of business in Connecticut. As such, the case must be governed by substantive principles of Ohio law. The defendant has now brought this motion to dismiss the complaint, asserting that the pleading fails to allege a cause of action under Ohio law. For purposes of this motion we must assume that the allegations of the complaint are true, and we address ourselves solely to the legal sufficiency of their significance. The complaint alleges that the plaintiff, as a patient, entered Euclid-Glenville Hospital on January 12,

1960. After two operations on his back, the plaintiff was successfully recovering when his hospital bed collapsed on February 17, 1960, throwing the patient to the floor. As an outgrowth of this incident, the plaintiff sued the hospital in the Court of Common Pleas in Cuyahoga County, Ohio, alleging that the collapse of the bed was due to a defective leg and that the defendant hospital knew of that defect.

In preparation for the defense of that lawsuit, the hospital's attorney, one R. Crawford Morris, allegedly requested that the Cleveland office for the defendant Aetna obtain from the plaintiff's treating doctor, Dr. Alexander Ling, all medical information about the plaintiff on the pretext that Aetna was investigating a claim against the doctor. The plaintiff asserts that there never was any complaint against his physician, and that the representation to him that the plaintiff intended to sue him was false. The plaintiff further alleges that, after the defendant had transferred the information from the doctor to Attorney Morris, the defendant, the doctor's malpractice insurance carrier, "intimidated" the doctor so that he declined to further treat the plaintiff. As a consequence plaintiff alleges that he was deprived of the treatment of the one doctor best qualified to treat him, and his hope for redress in the lawsuit against the hospital has been prejudiced by the divulgence of confidential information to defendant's attorney, R. Crawford Morris.

■ Our question, briefly, is this: If all these allegations are susceptible of proof, does the course of conduct complained of afford the plaintiff a right of action under Ohio law?

Although the language of the complaint is imprecise, at least in so far as it expresses the legal theory of recovery, we perceive of two separate avenues by which the plaintiff hopes to travel to success. The first complains of the interference by the defendant with the performance of the contractual duty of the treating physician; the second asserts that the defendant, by fraudulent representation, induced the corruption of confidences gained by that relationship. Although the reports of Ohio decisions are barren of binding authority on point, and persuasive authority from other jurisdictions is sparse (no doubt due to the traditionally high standards of ethical conduct in both the medical and legal professions), we conclude from our research that there is no authority which would compel us to dismiss the plaintiff's complaint. On the contrary, what little we find leads us to the conclusion that the plaintiff has properly asserted a cause of action.

Directing our attention to the allegation that defendant secured a breach of contract between the plaintiff and the doctor, we must first ascertain whether the alleged action of the doctor, if proven true, would give rise to redress. Before we may determine whether the defendant is liable for inducing this action, we first must assay the propriety of that which was induced.

■ It is, of course, axiomatic that a doctor is not required to answer the plea of all who seek his aid (Limbaugh v. Watson, 12 Ohio Law Abst. 150) (Ohio App.1932), but once he assumes the contractual duty to treat a patient, he may not evade that duty unless and until seasonable notice is given to the patient and he has the opportunity to secure adequate medical attention. As stated by the court in Morningstar v. Jones, 31 Ohio Law Abst. 440, 446 (Ohio App. 1940):

> "The general rule applicable to the duration and termination of the employment of a physician and surgeon is stated in 48 C.J. at page 1112, as follows:
>
> "'Unless the terms of employment, or notice, limit the services to be given, the relation of physician and patient, and the physician's employment, continue until the physician's services are no longer needed, or until terminated by common or mutual consent or at the will of either party.'

"However, the latter part of the above rule is limited by the decisions of the courts of Ohio, to the effect that although a patient may, in the absence of an agreement to the contrary, discharge a physician at any time, before a physician or surgeon can withdraw from the case, it is necessary for him to give reasonable notice to the patient in order that another physician may be procured, the character of the services of the physician and his relation to the patient being such that he is not permitted under the law arbitrarily to quit the services at any time without any cause, and leave his patient without medical attendance."

According to the allegations of the complaint, the plaintiff has been denied the attention of the one physician who is best equipped to treat the plaintiff by reason of his knowledge of plaintiff's medical background and injury. He further alleges that the discontinuation of treatment resulted in pain and suffering and the retardation of the healing process. Thus the question of whether the doctor's departure was justifiable becomes a question of fact, resolution of which must await further proceedings. The plaintiff has alleged conduct on the part of the doctor which, if proven true, the law would recognize as improper.

But the question with which we are here faced is whether a party who induces such misconduct may be held liable for its consequences. The defendant argues that, inasmuch as the contract between doctor and patient is terminable at will, no action will lie for inducing its breach. In Prosser, Torts, 955, 3d Ed. 1964, the author summarizes the authorities on this question thus:

"There is some authority [that no action lies] as to contracts which the promisor may terminate at will, on the theory that there is really nothing involved but an option on his part to perform or not. However, eminent legal writers to the contrary notwithstanding, the overwhelming majority of the cases have held that interference with employments or other contracts terminable at will is actionable, since until it is terminated the contract is a subsisting relation, of value to the plaintiff, and presumably to continue in effect."

The defendant cites Horth v. American Aggregates Corp., Ohio App., 35 N.E.2d 592, 31 Ohio Law Abst. 331,[1] where the court held that it was not a malicious inducement of a breach of contract for a person to enter into an agreement with another person knowing that such other person has a contract with a third party covering the same subject matter. In support of this holding, the court found a total lack of evidence on the question of whether the inducement was malicious. This, of course, is a question of fact which we cannot decide in the case at bar upon motion to dismiss. We must point out that the holding in the Horth case necessarily infers that a cause of action will lie for the *malicious* inducement of a breach of contract. The pleadings in this case adequately avoid whatever effect the holding in the Horth case might have upon the plaintiff's cause of action.

The defendant has also cited Lancaster v. Hamburger, 70 Ohio St. 156, 71 N.E. 289, 65 L.R.A. 856 (1904) for the proposition that a third party has *carte blanche* authority to interfere with a business relationship regardless of his motive. In Lancaster the court held that a passenger in a streetcar incurs no liability to a conductor for reporting to his superior on conductor's misconduct while

---

1. The defendant has also cited Akron Milk Producers, Inc. v. Lawson Milk Co., Ohio Com.Pl., 147 N.E.2d 512, 77 Ohio Law Abst. 275 (1958) for the proposition that where one has a genuine business purpose in open competitive fields, he may by fair and lawful persuasion interfere with contracts of another. This case is so wholly inapposite to the situation at bar as to deserve no consideration and little comment. It is sufficient to say that we are not here concerned with open legitimate competition for the marketing of a certain product.

on duty, despite the fact that the evidence indicated that the report was motivated by ill will. It is true, as the defendant states, that the court recognized that the general rule in Ohio was that "[I]t is immaterial by what motive one is prompted in the exercise of a clear legal right or the performance of a duty." (70 Ohio St. at 164, 71 N.E. at 291.) In the Lancaster case, however, the court held that the defendant, as a patron of the street railway company, was entitled to the benefit of the company's rules designed for the safety and comfort of its passengers, and was further entitled to report to the company any infraction of those rules. The defendant's membership in a protected class gave rise to the right which the court recognized there. In the case at bar, however, we can perceive of no absolute right in the defendant to interfere with the relationship between the plaintiff and Dr. Ling.

██ Next we are confronted with the defendant's assertion that a privilege exists which permits it to interfere with the performance of that contract in order that it might protect its own interest. On the question of privilege, Prosser summarizes the authorities thus:

> "Where the defendant acts to further his own advantage, other distinctions have been made. If he has a present, *existing economic interest* to protect, such as the ownership or condition of property, or a prior contract of his own, or a financial interest in the affairs of the person persuaded, he is privileged to prevent performance of the contract of another which threatens it * *."
> (p. 969)

But, according to the allegations of the complaint, there was no action threatened or contemplated against the treating physician; consequently there was no threat to an existing economic interest of the defendant. On the contrary, it appears that the only interest which the defendant had was to secure an unfair advantage in a lawsuit against its other insured, Euclid-Glenville Hospital. It is unfortunate that the same insurance company, represented by the same lawyer, bears the risk both for liability incurred by the hospital's negligence and for liability incurred by a doctor's malpractice. This affords the attorney a position of proximity from which he may, as alleged here, negate the expectation of confidentiality in the lawsuit against the hospital by suggesting to the doctor that he will be exposed to liability even though a complaint has been directed only against the hospital.

We are not unmindful of the admonition of Prosser, in speaking of inducing the interruption of contracts terminable at will, that—

> "So much more is allowed in the way of interference to further the defendant's own *legitimate* interests where the contract is subject to such termination, * * *."

We perceive of no such legitimate interest. The defendant claims that as the carrier of the doctor's malpractice insurance, it had the right to advise him to discontinue treating a potential claimant. But the complaint in this case reads that no action had been started or had been contemplated against the treating physician, and that there was no basis for the insurance company to expect a claim. Therefore, there was no threat to the financial interest of the insurance carrier which might justify their alleged actions in this case.[2] As we noted above,

2. It seems a bit unreasonable for an insurance carrier to seriously anticipate an action based upon medical malpractice against a doctor when the patient-plaintiff is injured by the collapse of a bed. The doctor is many things to his patient, but he is not a mechanic charged with the duty of maintaining the mechanical aspects of sleeping facilities. Even if it had a protectable interest endangered, we think public policy forbids such interference with the doctor-patient relationship unless and until suit is brought by plaintiff against the doctor. Suffice it to say, for the purposes of this motion in this case, the defendant has shown no protectable interest to justify its alleged intrusion into the contractual relationship of doctor and patient.

the defendant has cited Ohio cases where strangers to business contracts have been permitted to interfere with those contracts even though they had no interest to protect nor any privilege to intervene. We do not recognize these cases as even persuasive authority herein because they involve purely commercial situations. When an ailing person selects a physician to treat him, he does so with the full expectation that such physician will do his best to restore him to health, and the contract into which they enter is deserving of more attention from the law than a businessman's expectation of profit from a purely commercial transaction. Our view of Ohio law, therefore, teaches us that the physician-patient contract is not purely commercial and should not permit a third party to effect its rupture. In this regard plaintiff has properly alleged a cause of action under Ohio law.

█ The plaintiff has also predicated his right to relief upon the allegation that the defendant, by falsely representing to the treating doctor that a claim was to be lodged against him, induced the doctor to reveal confidences gained during that relationship and to turn over to the defendant's attorney the doctor's complete file. Again, in order that a cause of action may be sustained against the inducer, we must first appraise the action that was induced. We must first investigate the propriety of a doctor's disclosure of information to a third party without the patient's consent.

Actions against doctors for releasing information gained while treating patients are rare in American jurisprudence, which, in itself, is something of a tribute to the medical profession. When recovery has been allowed, it has been grounded upon either of two factors: (1) the testimonial privilege statute which precludes disclosure in court of information gained through the physician-patient relationship, and (2) a requirement in the state medical licensing statute which precludes the disclosure of such confidential information.

In Berry v. Moench, 8 Utah 2d 191, 331 P.2d 814, 73 A.L.R.2d 315 (1958), the plaintiff was a former patient of the defendant doctor who had surrendered certain disparaging information about the plaintiff to the plaintiff's prospective in-laws. The Supreme Court of Utah held that a cause of action arose for these wrongful disclosures, basing its decision on a public policy of non-disclosure as evidenced by that state's privileged communication statute.

In Clark v. Geraci, 29 Misc.2d 791, 208 N.Y.S.2d 564 (N.Y.Sup.Ct., Trial Term, 1960), the court recognized the existence of a cause of action on behalf of a patient against a physician but held that the plaintiff there had waived his right of action because partial disclosure had been authorized. Here, too, the cause of action was founded on a testimonial privilege statute.

In Simonsen v. Swenson, 104 Neb. 224, 177 N.W. 831, 9 A.L.R. 1250 (1920), the court sustained a cause of action against a doctor for wrongful divulgence, and based its decision upon that portion of the state statutes which conditioned the practice of medicine upon the grant of a license by the state. This license could be revoked, under the terms of the statute, for any unauthorized or unprivileged betrayal of communication. The court held that that was a sufficient expression of public policy with which to fashion the right of redress against the voluble physician.

█ The statutes of Ohio contain both basic expressions of public policy which have persuaded these other courts. Our privilege statute, Ohio R.C. § 2317.02, proscribes against testimony by a physician " * * * concerning a communication made to him by his patient in that relation, or his advice to his patient * * *." Also, the practice of medicine in Ohio is conditioned upon the grant of a certificate by the State Medical Board. That license may be revoked for a variety of reasons, including grossly unprofessional or dishonest conduct. This term is defined in Ohio

R.C. § 4731.22 to include the wilful betrayal of a professional secret. Therefore, we conclude that the courts of Ohio, confronted with this clear expression of public policy, would agree with the expression of the Supreme Court of Washington in Smith v. Driscoll, 94 Wash. 441, 162 P. 572, 573, L.R.A.1917C, 1128 (1917):

> "Neither is it necessary to pursue at length the inquiry of whether a cause of action lies in favor of a patient against a physician for wrongfully divulging confidential communications. For the purposes of what we shall say it will be assumed that, for so palpable a wrong, the law provides a remedy."

We think it is abundantly clear that one who induces such misconduct must also answer for it. It is axiomatic that the physician-patient relationship is a fiduciary one. The policy of the law is to promote a full and free disclosure of all information by the patient to his treating physician; this information entrusted to the doctor creates a fiduciary responsibility in regard to that information. Those confidences in the trust of a physician are entitled to the same consideration as a *res* in the control of a trustee, and the activities of a doctor in regard to those confidences must be subjected to the same close scrutiny as the activities of a trustee in supervising a *res*. Consequently this aspect of the instant case must be appraised in the light of principles governing third party complicity with trustee's misfeasance.

It is well established in Ohio that a knowing participant, as well as an errant trustee, is equally amenable to account for wrongfully diverted trust property. Shuster v. North American Mortgage Loan Co., 139 Ohio St. 315, 40 N.E.2d 130 (1942). Cf. also, 2 Restatement of Trusts, 2d Ed., § 326, 1959. This is true even if the third party is not the transferee of trust property. If a third party knowingly joins the trustee in purchasing for profit the trust property under unlawful circumstances, he becomes jointly and severally liable with the trustee for any resultant profit from that transaction. In re Van Sweringen Corp., 119 F.2d 231, 234 (6th Cir. 1941). Thus it is clear that Ohio law would offer no advantage or benefit to the participating third party which would not be available to the perfidious fiduciary. They stand on equal ground. From this we conclude that the Defendant Aetna must answer the plaintiff's allegation that it induced the divulgence of confidential information.

Viewing this complaint against the background of general law, brought into focus by the above citations to Ohio cases, we hold that the plaintiff has stated a cause of action against the defendant Aetna Casualty & Surety Company. Defendant's Motion to Dismiss is accordingly overruled.